**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3731-15T2

LOUISE HOCKMAN,

    Plaintiff-Respondent,

v.

BURRELLYS LIMITED
LIABILITY COMPANY, and
NICOLE BURRELL,

    Defendants-Appellants,

and

CAREN FREDERICK,

    Defendant-Respondent.

_____

        Argued September 12, 2017 — Decided October 2, 2017

        Before Judges Yannotti, Carroll, and Mawla.

        On appeal from Superior Court of New Jersey,
        Law Division, Middlesex County, Docket No. L-
        0365-14.

        Tracy L. Frankel argued the cause for
        appellants (Farber Brocks & Zane, LLP,
        attorneys; Ms. Frankel, on the briefs).

        Michael S. Savett argued the cause for
        respondent Caren Frederick (Clark & Fox,
        attorneys; John M. Clark, on the brief).

Nicholas J. Leonardis argued the cause for respondent Louise Hockman (Stathis & Leonardis, LLC, attorneys; Mr. Leonardis and Randi S. Greenberg, on the brief).

PER CURIAM

Plaintiff Louise Hockman entered a sandwich shop owned and operated by Nicole Burrell and Burrellys, LLC (collectively Burrellys). Upon noticing her vehicle was improperly parked she began to exit the store and allegedly slipped on an unknown liquid, fell, and severely injured her right leg. A jury trial ensued and Burrellys was determined eighty-percent liable for plaintiff's injuries and plaintiff twenty-percent. The jury awarded plaintiff $1,280,081.67.

Burrellys appeals from the November 20, 2015 denial of summary judgment; the September 18, 2015 entry of summary judgment in favor of the landlord, Caren Frederick; the denial of in limine motions to bar the testimony of plaintiff's liability expert and certain medical expert testimony and evidence; evidentiary rulings made during trial; and an order denying a motion for reconsideration, a new trial and remittitur. We hold the trial court erred by permitting plaintiff's liability expert to testify in a speculative manner as to the source of the liquid plaintiff slipped on, causing the capacity for an unjust result. For these

2

reasons, we affirm in part, reverse in part and remand for a new trial.

I.

Prior to trial, the court addressed summary judgment motions by Frederick and Burrellys. On September 18, 2015, the trial court granted summary judgment in favor of Frederick. On November 20, 2015, the court denied Burrellys's motion for summary judgment, finding a sufficient material factual dispute regarding the proximate cause of plaintiff's fall to permit the matter to be addressed by the jury.

The matter was later tried before a jury. Burrellys addressed several in limine motions to the trial judge, one of which sought to exclude the testimony of plaintiff's liability expert Dr. Wayne Nolte on the grounds of a net opinion. Specifically, Burrellys challenged Nolte's opinion on the basis he could not opine as to the source of the liquid plaintiff slipped on. The trial judge denied the application to bar Nolte's testimony and report, but restricted Nolte from speculating as to the source of the liquid. At trial, however, Nolte testified beyond the scope established in the in limine ruling.

Burrellys also moved in limine to bar medical illustrations utilized by plaintiff's medical expert, Surender M. Grover, M.D., at a de bene esse deposition because the illustrations were

allegedly exaggerated and thus prejudicial. The trial judge denied the motion finding that the illustrations were not prejudicial, but instead an aid to the doctor's testimony.

In addition, Burrellys moved in limine to bar Dr. Grover's testimony regarding plaintiff's poor future prognosis as speculative and not within the scope of Dr. Grover's report. The trial judge denied the motion because Dr. Grover had opined in his report regarding plaintiff's prognosis and the testimony was not speculative.

Burrellys also moved to admit statements attributed to plaintiff in the hospital discharge summary pursuant to N.J.R.E. 803(c)(4). According to the hospital's records, plaintiff reported that she felt dizzy before the fall. The trial judge declined to address the motion, noting it was premature because plaintiff had yet to testify.

## II.

The following facts are taken from the trial testimony. Plaintiff visited Tastee Sub, owned and operated by Burrellys, to purchase a sandwich. She went up two to three steps and approached the counter to place her order. After ordering, plaintiff informed Burrell she was going to make sure her car was parked legally. Before taking her first step down or reaching the banister, plaintiff's "feet flew up in the air to where [she] could see

them." When plaintiff landed, her ankle hurt causing her to reach for it, at which point she noticed "the very bottom of [her] jeans . . . [was] wet."

Plaintiff did not see any liquid in the area where she fell, but she did not have any wetness on her jeans when she entered the shop. It was undisputed it had not rained or snowed the day of the incident. Plaintiff's ankle was not bleeding and the only other liquid present was blood from an injury to the back of her head as a result of the fall.

Plaintiff was hospitalized and had surgery as a result of her ankle injury. After the surgery, plaintiff wore a medical walking boot for several months, attended rehabilitation for over two months, and began physical therapy. Plaintiff used a walker for ten months, including when she returned home; required the aid of a visiting nurse; and had ongoing physical therapy.

Plaintiff testified she still has pain in her ankle, and experiences swelling when she walks. She stated she is unable to take walks, go shopping, or perform chores as she did before the incident. Plaintiff could not drive for two years and when she resumed driving, could not do so for long distances.

Dr. Grover treated plaintiff at the hospital after her fall and testified on her behalf. He testified regarding plaintiff's injury and summarized her ankle fracture as "[p]retty severe."

A-3731-15T2

Likewise, Dr. Grover described in detail the surgery he performed. He said the surgery was required if plaintiff "ever wanted to walk" and explained it required the placement of hardware into the bone. He described the surgery as successful.

Dr. Grover testified he continued to care for plaintiff and discussed her post-operation therapy regimen. He also explained plaintiff advised she was continuing to experience pain, which lasted more than a year, for which he recommended another surgery to remove the hardware in plaintiff's ankle. In addition, Dr. Grover recommended further surgery because plaintiff's injury was not healing properly and opined plaintiff's pain would "get worse and worse in time, where the arthritis will progress and make her more and more stiff[] and painful." Dr. Grover testified it was "a bad prognosis." He concluded plaintiff's injury was permanent.

Dr. Andrew Hutter, an orthopedic surgeon, provided expert testimony for Burrellys. He examined plaintiff in 2015 and concluded she was "treated appropriately postoperatively" and there "[d]id not appear [to be] anything unusual in her postoperative course." Dr. Hutter agreed plaintiff sustained a fracture dislocation of her right ankle as a result of the February 26, 2012 incident and found she underwent the appropriate treatment for her injury. He concluded plaintiff reached the maximum medical improvement for her ankle, but conceded there "was a moderate

A-3731-15T2

degree of orthopedic permanency to the right ankle," and it was possible the pain could get better or worse.

Dr. Nolte, a civil and mechanical engineer, testified as plaintiff's liability expert. He stated the shop's flooring was a vinyl composition tile, and opined that it was "an acceptable floor, good floor." He explained "[t]he type of slip [plaintiff] experienced is [called] a hydroplane. She was no longer walking on the . . . tile surface, she was now walking on the liquid that was free to move over the tile surface, because the tile surface cannot absorb any liquid."

Nolte opined the operator of the shop has an obligation under the Uniform Fire Code in New Jersey to keep the means of egress "in a safe condition at all times," requiring inspection, maintenance, and warnings when necessary. He found no maintenance or inspection records. He further stated:

> Again, here [is] a sub shop. You have sandwiches, you have vinegar, you have oil, you have liquids, soda, water, whatever. There's a probability of . . . liquid getting on the floor. So, what do you do to prevent that, to keep that means of egress in a safe condition? And here, you know, your standard procedure is you do inspections, do maintenance, you put a mat down, you put a warning sign down. None of that was [done] here.

He concluded:

there was a hazardous condition created, and that was the lack of safety at the means of egress. [The store d]idn't employ maintenance, didn't employ inspection, did not have a mat, did not have any signs, and yet it's an area where there's a probability of liquid being on the floor from the type of operation that's there.

Burrell testified she was the only employee present at the time of the incident. She explained when customers entered the shop, they would order food "[t]o go"; there was no dining area or place to eat in the shop. She testified the last customer to enter the shop before plaintiff departed over one-half hour earlier. Burrell saw plaintiff enter the shop and did not notice anything on the floor. Burrell did not see plaintiff fall, but attended to her immediately afterwards and noticed blood coming from the back of plaintiff's head, prompting her to call 9-1-1 and place a clean towel under her head. Burrell did not notice any liquid on the floor.

Burrell testified the shop had a refrigerator containing side salads, canned soda, and two liter bottles of soda. She stated that she did not keep maintenance records or records of daily inspections. She had no recollection of whether she swept the floor the day of the incident, but if she did not "it would be because there was not[h]ing on the floor," since she routinely

inspected it. Burrell explained if she had seen something on the floor, she would have cleaned it up immediately.

## III.

Following summations, the trial judge instructed the jury, specifically charging both actual or constructive notice and the mode-of-operation theories of liability. The jury verdict sheet required the jury to answer several interrogatories; namely, on liability whether Burrellys was negligent, and whether Burrellys's negligence was a proximate cause of plaintiff's accident. The jury was also asked whether plaintiff was negligent and whether her negligence was a proximate cause of the accident. The jury responded in the affirmative to both questions and was then required to assign to the parties percentages of responsibility for plaintiff's fall and injuries. The jury found Burrellys eighty-percent and plaintiff twenty-percent liable. The jury awarded plaintiff damages of $1,200,000 for pain and suffering and all of her medical expenses resulting from the incident totaling $80,081.67.

Burrellys thereafter filed a motion for reconsideration and a motion for remittitur, both of which were denied. The trial court molded the jury award to reflect Burrellys's eighty-percent share and a Medicare lien. After adding interest, attorney's fees

and compensation for plaintiff's witnesses, final judgment was entered on April 19, 2016, in the amount of $1,035,359.69.

IV.

Burrellys asserts the trial court erred by denying summary judgment on the issue of causation because plaintiff presented no evidence she slipped on any substance. Burrellys also contests the granting of summary judgment to Frederick because plaintiff's expert asserted the flooring, which was Frederick's responsibility, was slippery and caused plaintiff's fall. We disagree with both arguments.

Summary judgment must be granted if the court determines "there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). The court must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995). We "review the trial court's grant of summary judgment de novo under the same standard as the trial court." Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016).

The following facts were presented to the trial court on summary judgment regarding causation. Plaintiff gave a deposition stating it was not raining on the day of the incident. She did not notice any substances on the floor when she entered the shop. She testified she believed she slipped on "some kind of liquid" because, when she landed, her "pant leg felt wet." She testified she never saw liquid on the floor but "felt [it on her] pants."

Burrell testified at her deposition that she was the only person working at the shop the day of the incident, and when plaintiff entered the shop, there were no other customers present. Burrell testified the last customer departed more than thirty minutes before plaintiff arrived. She stated if a customer asked for condiments, they would be put on the sandwich and then each sandwich wrapped and given to the customer. After plaintiff's fall, Burrell testified she saw nothing else on the floor other than plaintiff's blood. She did not touch plaintiff's clothes to see if they were wet. She stated she usually swept during the afternoon and mopped at the end of the day, unless it was necessary to mop earlier.

The motion judge also had Nolte's expert report, which stated:

> The sub shop sold drinks and had a self-
> service refrigeration unit nearby the entrance
> door. Again, mats were not in place at the
> entrance to absorb any liquid that may come
> from or be spilled from one of the drinks sold

to a customer. Caren Frederick stated that the building did not contain a roof leak at the time. The reasonable source of liquid on the floor was from a customer who purchased a drink.

On November 20, 2015, the trial court issued an oral decision denying summary judgment stating:

> Plaintiff demonstrated the nature of the Tastee Sub Shop business as a delicatessen which permitted patrons to walk around the common areas with drinks, . . . and did not restrict the carrying of or consumption of food and drink.
>
> In cases that have previously applied the [mode-of-operation] doctrine, the Plaintiffs weren't able to specifically identify the exact source of the slipping hazard.
>
> . . . .
>
> These cases made clear that Plaintiffs need not specifically identify the source of the hazard in order to obtain the benefit of the mode of operation charge. It's enough that Plaintiff produced sufficient proof permitting the Jury to find the hazard more than likely arose on the merchant's mode of operation.
>
> Plaintiff produced evidence that a source of the liquid on the floor could potentially be the self-service refrigeration unit located next to the means of egress of the store by the stairway.
>
> Plaintiff's expert opines that the customers carrying drinks out of the refrigerator and shop provide a reasonable opportunity for liquid to get on the floor in the area of the customer.

12

Further, several . . . safety councils . . . note the good practice of maintaining the premises by equipping floors with mats to absorb liquid.

. . . .

. . . [T]he record contains conflicting accounts of the events that transpired before and after Plaintiff's fall. First, the amount of time that the . . . alleged clear liquid remained on the ground is unknown.

Plaintiff testified that she did not see the liquid on the floor before her fall. After the fall, Plaintiff looked at her clothing and found that the bottom of her pant leg was wet. . . .

. . . .

Also, at issue is whether Defendant's maintenance of the store was unreasonable. . . .

. . . .

Additionally, an issue[] remains regarding the reasonableness of Defendant's decision not to use floor mats. . . .

. . . .

[A]ny questions pertaining to the reasonableness of [d]efendant's] actions or inactions should be left for the Jury.

"[A] negligence cause of action requires the establishment of four elements: (1) a duty of care, (2) a breach of that duty, (3) actual and proximate causation, and (4) damages." Jersey

Cent. Power & Light Co. v. Melcar Util. Co., 212 N.J. 576, 594 (2013).

> Business owners owe to invitees a duty of reasonable or due care to provide a safe environment for doing that which is within the scope of the invitation. The duty of due care requires a business owner to discover and eliminate dangerous conditions, to maintain the premises in safe condition, and to avoid creating conditions that would render the premises unsafe. Ordinarily an injured plaintiff asserting a breach of that duty must prove, as an element of the cause of action, that the defendant had actual or constructive knowledge of the dangerous condition that caused the accident.
>
> [Nisivoccia v. Glass Gardens, Inc., 175 N.J. 559, 563 (2003) (citations omitted).]

However, under the mode-of-operation doctrine a plaintiff is relieved of proving actual or constructive notice where, "as a matter of probability, a dangerous condition is likely to occur as the result of the nature of the business, the property's condition, or a demonstrable pattern of conduct or incidents." Ibid. In such a case, the plaintiff is afforded "an inference of negligence, imposing on the defendant the obligation to come forward with rebutting proof that it had taken prudent and reasonable steps to avoid the potential hazard." Id. at 563-64; accord Bozza v. Vornado, Inc., 42 N.J. 355, 360 (1964) ("[D]efendant may then negate the inference by submitting evidence of due care.").

As noted by our Supreme Court in <u>Prioleau v. Kentucky Fried Chicken, Inc.</u>, 223 <u>N.J.</u> 245, 260 (2015), "in all of its prior mode-of-operation cases, th[e] Court has emphasized the self-service nature of the defendant's business."

> [T]he mode-of-operation doctrine has never been expanded beyond the self-service setting, in which customers independently handle merchandise without the assistance of employees or may come into direct contact with product displays, shelving, packaging, and other aspects of the facility that may present a risk. The distinction drawn by these cases is sensible and practical. When a business permits its customers to handle products and equipment, unsupervised by employees, it increases the risk that a dangerous condition will go undetected and that patrons will be injured. Thus, the mode-of-operation rule is not a general rule of premises liability, but a special application of foreseeability principles in recognition of the extraordinary risks that arise when a defendant chooses a customer self-service business model.
>
> [<u>Id.</u> at 262.]

In <u>Craggan v. IKEA U.S.</u>, 332 <u>N.J. Super.</u> 53, 62 (App. Div. 2000), we stated "[t]he unifying factor, however, is a mode of operation designed to allow the patron to select and remove the merchandise from the premises without intervention from any employee of the storekeeper."

We have found the mode-of-operation doctrine to apply even when plaintiff cannot definitively identify the substance that caused the fall. In <u>Walker v. Costco Wholesale Warehouse</u>, 445

15

N.J. Super. 111, 114 (App. Div. 2016), the plaintiff was shopping at the defendant's warehouse store and passed a vendor offering free samples of cheesecake in small paper cups. Plaintiff then slipped on a substance on the floor, which he initially perceived as having a yogurt-like appearance. Ibid. Plaintiff also noted "his jogging pants were 'wet' and 'smeared' from the substance, although he 'couldn't tell [the jury] exactly what it was.'" Ibid. (alteration in original). The panel in Walker stated:

> We recognize that plaintiff was unable to identify with precision the substance on the floor that allegedly caused him to slip. There is a plausible basis, however, to believe that the white substance could have been cheesecake, which may well have become softer, creamier, and more "yogurt-like" in appearance after being displayed in sample cups for some unspecified time at room temperature. Plaintiff's inability to describe the substance in more exact terms is understandable given the sudden and traumatic nature of his fall. Of course, he may well have been mistaken in his description and the substance could have come from another source, but that is a factual matter for the jury to evaluate.
>
> [Id. at 126.]

The wetness of the plaintiff's pant leg in Walker was enough to infer he had slipped on a substance causing his fall. The panel concluded:

> The trial court failed to give plaintiff the benefit of these reasonable inferences when it declined to allow the jurors as fact-

16

finders to consider whether the factual predicates for mode-of-operation liability were proven here. Although plaintiff has not provided a particularly compelling factual basis to support his mode-of-operation argument, he presented enough evidence to at least justify the model charge being issued. The jurors should have been allowed to evaluate whether he met his threshold burden of proving the necessary factual nexus to a defendant's self-service activity. There also remain important factual questions about whether the substance was actually observed on the floor, whether [defendant]'s inspections were adequate, and whether the locations and hours of the demonstrators' activities actually coincide with plaintiff's theory of liability.

[Id. at 127.]

We are convinced that the motion judge erred by finding that the mode-of-operation doctrine applies in this case. Plaintiff did not present sufficient evidence to show that the doctrine applied. As Burrell explained, sandwiches were prepared and wrapped for the customers. The shop had a refrigerator, which contained salads and beverages in sealed containers. There was no evidence that the dangerous condition in this case was due to the customers' handling of the items in the refrigerator. The facts did not present a situation where the customers' handling of the items increased the risk that a dangerous condition could go undetected and patrons would be injured. Moreover, the facts in this case are significantly different from those in Walker

17                                                                    A-3731-15T2

because here there was no ready source of the alleged liquid or substance found on plaintiff's clothing similar to any substance being dispensed nearby.

Nevertheless, the motion judge did not err by denying Burrellys's motion for summary judgment because there were genuine issues of material fact as to whether Burrellys had actual or constructive notice of the alleged dangerous condition. Plaintiff presented evidence allegedly showing that Burrellys failed to adequately inspect and maintain the floor in the shop, and did not use mats near the steps where plaintiff fell. Plaintiff also presented expert testimony from her liability expert Nolte on this issue.

Burrellys further argues that the motion judge erred by granting summary judgment to Frederick. Again, we disagree. Burrellys argues "the court below seemed to ignore Mr. Nolte's reported opinion that the vinyl flooring of the shop was improper for a sandwich shop."

In his expert report, Nolte stated:

> The vinyl composition tile floor inside the sub shop was not going to absorb liquid. The liquid was going to sit on top of the floor and create a hydroplane for anyone who came in contact with it. The mechanics of the fall as described by Louise Hockman were consistent with her foot or feet hydroplaning on the floor surface due to a liquid.

18

The trial court correctly decided that there was no genuine issue of material fact regarding Frederick's alleged liability, and Frederick was entitled to judgment as a matter of law. Section 10(e) of the store lease between Frederick and Burrellys states, in pertinent part: "The Tenant shall . . . [k]eep the store and any other part of the Building used by the Tenant as clean and safe as possible."

Furthermore, Section 11 of the lease states: "The landlord shall: (a) Maintain the common areas of the Building in a clean condition. (b) Make any necessary repair to the Store and vital facilities within a reasonable time after notice by the Tenant. (c) Maintain the elevators in the Building, if any." In addition, Section 15 provides, in pertinent part: "The Landlord is not liable for loss, injury, or damage to any person or property unless it is due to the Landlord's act or neglect."

Therefore, the lease placed the duty to maintain the leased space in a safe condition on Burrellys. Frederick only assumed a duty to maintain the common areas and to make repairs upon notice from Burrellys. The area where plaintiff was injured was not a common area, and Frederick was never notified of a condition needing repair. Accordingly, under the lease, the duty to keep the area where plaintiff was injured in a safe condition was solely Burrellys's.

Although Burrellys disclaims Nolte's report respecting its own liability, the report does not present either a duty, a breach of it by Frederick, or a material dispute in fact as to either duty or breach, which would warrant denial of Frederick's motion for summary judgment. For these reasons, the motion judge correctly decided Frederick was entitled to summary judgment.

V.

As noted in the preceding section, the trial judge erred by charging the jury on mode-of-operation. By doing so, the jury could find negligence without finding Burrellys had actual or constructive notice of the alleged dangerous condition. Under the circumstances of this case, the mode-of-operation charge was improper and the error requires a new trial.

VI.

Before trial commenced, Burrellys made in limine motions to exclude Nolte's expert report and testimony as a net opinion. The trial court did not bar Nolte's report, but limited his testimony regarding the source of the liquid on which plaintiff slipped. We hold the admission of testimony by Nolte regarding the source of the liquid exceeded the scope of the in limine determination. The admission of this improper testimony was clearly capable of misleading the jury thereby causing an unjust result, and warrants reversal for a new trial.

Burrellys argues the trial court should have barred Nolte's testimony because his "conclusion that a customer may have taken a drink from the refrigerator and spilled it causing the liquid on the floor, which in turn caused plaintiff to slip was 'total speculation.'" Rather than bar plaintiff's expert on the eve of trial, the trial judge opted to restrict Nolte's testimony. The trial judge stated as follows:

> [T]he expert, presumably, is basing his determination that there was a liquid on the plaintiff's testimony that she felt an area that was damp. Now, the source of that liquid, I agree with you, the expert should not necessarily be able to speculate as to where it came from. In other words, if [it] probably came from a customer that purchased a drink. There's a self-service machine there. That, I agree, is speculation. But the fact that there was some type of liquid, whatever it may be, came from the plaintiff's testimony that she felt something wet there.
>
> . . . .
>
> [I]t should not come from this expert that it was soda purchased by a customer, or likely to be because, quite frankly, you know, that is sheer speculation.

Nolte did not, however, adhere to this limitation during the trial. He testified: "[I]t's a sub shop where you're dealing with oils and . . . vinegar, there's a refrigeration unit not too far from the entrance where it's self service[.]" This prompted an objection from defense counsel and the trial judge to warn the

21

testimony was "treading very close to . . . violating the spirit of the ruling," which was "to prevent this witness from testifying as to what might be a source."  The trial judge continued:

> So, now he's talking about all of the things that it could have come from, which is really speculation on his part, because there's no evidence in the record as to where this came from.  Now, we know it's a sub shop, we know they serve all of these things, and so let the jury make those calls[.]

Defense counsel asked the court to "instruct the jury to disregard what [Nolte] just said."  Plaintiff's counsel replied: "You want to highlight the answer?  Okay."  The court said: "So, what do you want me to tell them?"  Defense counsel replied: "[L]et's move on. Thanks, Judge."

Nolte continued to imply plaintiff slipped on a liquid and opined about the potential sources of the liquid.  He testified: "[I]t wasn't until she got near the stairway on her way out that all of a sudden she encountered a liquid that caused her to slip." He then suggested a source for the substance: "Again, here [is] a sub shop.  You have sandwiches, you have vinegar, you have oil, you have liquids, soda, water, whatever.  There's a probability of water — or — I keep saying water, but of liquid getting on the floor."  Nolte later testified: "[I]t's an area where there's a probability of liquid being on the floor from the type of operation that's there."  When asked whether "the liquid that was on the

22

floor came about from the manner in which Burrellys LLC does their business," he responded, "that is my opinion."

N.J.R.E. 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

The net opinion rule, a corollary of N.J.R.E. 703, is more or less "a prohibition against speculative testimony." Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997). "That is, an expert's bare opinion that has no support in factual evidence or similar data is a mere net opinion which is not admissible and may not be considered." Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 372 (2011).

"[E]xperts generally[] must be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are scientifically reliable." Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992). Thus, "expert opinion [must] be grounded in '"facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in

evidence but which is the type of data normally relied upon by experts."'" Townsend v. Pierce, 221 N.J. 36, 53 (2015)(citation omitted).

Here, there was no evidence to permit Nolte to suggest the source of the liquid, which caused plaintiff's fall. Therefore, the trial court's in limine ruling limiting his testimony was correct. However, when Nolte ran afoul of the trial judge's in limine instruction, defense counsel objected only once, contemplated a curative instruction, and declined to pursue it.

Notwithstanding counsel's failure to strike Nolte's improper testimony and seek a curative instruction, the admission of Nolte's testimony was a clear violation of the judge's in limine ruling. The admission of this improper testimony constituted plain error, that is, and error "clearly capable of producing an unjust result." R. 2:10-2.

Nolte was the only engineering expert in this case. He not only identified the substance that plaintiff slipped on, he also identified the potential source of the substance. As the judge ruled, there was no evidence to support these statements. The jury was more likely to rely upon these statements because they were made by a person qualified as an expert. We therefore conclude that the improper admission of this trial testimony requires reversal of the judgment and a new trial.

VII.

On appeal, Burrellys also argues: (1) the court erred by allowing plaintiff to use certain medical illustrations prepared by Dr. Grover; (2) the court erred by refusing to allow the use of statements attributed to plaintiff in the hospital discharge summary; (3) a new trial is required because plaintiff's counsel made certain allegedly prejudicial comments in his opening and summation; (4) the court erred by denying its motion for a directed verdict; and (5) the jury's award was excessive. In view of our decision reversing the judgment and remanding the matter for a new trial due to the erroneous charge of the mode-of-operation doctrine and the admission of Nolte's improper testimony, we need not address these arguments.

Affirmed in part, reversed in part, and remanded for a new trial. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3731-15T2